**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TODD JADLOW, derivatively on behalf of SELECTQUOTE, INC., | |
| Plaintiff, | C.A. No. _____ |
| v. | |
| TIMOTHY R. DANKER, RAFFAELE SADUN, DONALD BRITTON, EARL DEVANNY III, DENISE DEVINE, WILLIAM GRANT II, DONALD HAWKS III, KAVITA K. PATEL, and RAYMOND WELDON, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| SELECTQUOTE, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Todd Jadlow ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant SelectQuote, Inc. ("SelectQuote" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Timothy R. Danker ("Danker"), Raffaele Sadun ("Sadun"), Donald Britton ("Britton"), Earl Devanny III ("Devanny"), Denise Devine ("Devine"), William Grant II ("Grant"), Donald Hawks III ("Hawks"), Kavita K. Patel ("Patel"), and Raymond Weldon ("Walden") (collectively, the "Individual Defendants" and with SelectQuote, "Defendants") for breaches of their fiduciary duties as directors and/or officers of SelectQuote, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Danker, Devanny, Devine, Grant, Hawks, Patel, and Weldon for

1

violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); against Defendants Danker, Sadun, Britton, Devanny, Devine, Grant, Hawks, and Weldon for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Exchange Act; and against Defendants Danker and Sadun for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SelectQuote, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by SelectQuote's directors and officers from May 20, 2020 through August 25, 2021, both dates inclusive (the "Relevant Period").

2.      Founded in 1985, SelectQuote is an insurance distributor incorporated in Delaware and based in Overland Park, Kansas. The Company operates a direct-to-consumer platform and categorizes its insurance policies into three segments: Senior, Life, and Auto & Home. A significant majority of the Company's revenue comes from its Senior segment. For instance, of the Company's $937.8 million in reported revenues for the fiscal year ended June 30, 2021 (the "2021 Fiscal Year"), $728.7 million came from the Senior segment.

3.     Americans aged 65 years and older are eligible for federal health insurance coverage called Medicare ("Original Medicare"). However, seniors can also choose to obtain the benefits of Original Medicare plans through Medicare Advantage Plans, which are offered by approved private companies. If a senior joins a Medicare Advantage Plan, Original Medicare pays a fixed amount for monthly coverage and the enrollee will have the same rights and protections as afforded under Original Medicare, but most Medicare Advantage Plans also offer coverage for things not covered by Original Medicare, like vision, hearing, dental, and fitness programs. Medicare Advantage Plans may or may not include a monthly premium.

4.     Separate and apart from Medicare Advantage Plans, seniors can also elect to enroll in Original Medicare and obtain Medicare Supplement Insurance, sometimes referred to as Medigap. Medigap policies differ from Medicare Advantage Plans in that seniors obtain Original Medicare benefits through Medicare Advantage Plans, while Medigap policies supplement Original Medicare benefits.

5.     SelectQuote's Medicare Advantage and Medicare Supplement plans accounted for 78% of the Company's approved Senior policies for the 2021 Fiscal Year.

6.     The Medicare Annual Enrollment Period ("AEP") runs from October 15 to December 7 every year. During this period, seniors can join, switch, or drop Original Medicare plans or Medicare Advantage Plans.

7.     Prior to 2019, federal policies provided for a Medicare Advantage Disenrollment Period from January 1 to February 14 of each year (the "Disenrollment Period"), during which time beneficiaries who had selected Medicare Advantage Plans had the opportunity to disenroll from Medicare Advantage coverage and return to Original Medicare. However, due to changes in applicable policies, as of 2019, a Medicare Advantage Open Enrollment Period was implemented

("OEP"),[1] which stretches from January 1 through March 31 every year. Like was true during the Disenrollment Period, during the OEP beneficiaries can drop Medicare Advantage Plans and return to Original Medicare. However, the OEP also allows beneficiaries to switch between Medicare Advantage Plans, which was not true of the Disenrollment Period.

8.     Given the importance of Medicare Advantage Plans to the Company's business, the 2019 implementation of the OEP materially affected the Company's operations and prospects. Specifically, the OEP's longer window and the new option for Medicare Advantage Plan beneficiaries to switch between Medicare Advantage Plans during OEP meant that beneficiaries faced fewer barriers in dropping the Company's Medicare Advantage Plans in favor of a different policy. Accordingly, the Company faced a greater risk that enrollees in Medicare Advantage Plans would drop their plans within the first months after enrollment, a phenomenon known as rapid disenrollment.

9.     Prior to the Company's May 2020 initial public offering ("IPO"), the Company began experiencing lower-than expected renewal rates, known as persistency rates, for the group of policies with effective dates in 2019, referred to as the 2019 cohort. This phenomenon coincided with the new OEP. As a result of declining persistency rates, the actual renewal commissions the Company earned fell below the Company's previous estimates regarding future renewal commissions. Given the nature of the Company's accounting practices, this required adjustments to the Company's financial statements.

10.     The challenges presented by the new OEP and the Company's declining persistency rates arrived just prior to the Company's efforts to go public. On February 12, 2020, the Company

---

[1] An enrollment period substantially similar to the OEP also existed prior to 2010, as a predecessor to the Disenrollment Period.

filed its registration statement on Form S-1 with the SEC, which was subsequently amended four times and declared effective on May 20, 2020 (the "Registration Statement"). On May 22, 2021, the Company filed a prospectus on Form 424B4, which formed a part of the Registration Statement (the "Prospectus," and together with the Registration Statement, the "Offering Documents").

11.    The Company's stock began trading on the New York Stock Exchange ("NYSE") on May 21, and the IPO was completed on May 26, 2020. The Company sold 18 million shares of common stock and certain selling stockholders sold an additional 14.78 million shares of common stock. The Company raised approximately $333.1 million in net proceeds.

12.    In the Offering Documents and throughout the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements concerning SelectQuote's business, operations, and prospects. Specifically, during the Relevant Period, the Company repeatedly reported inflated financial metrics, including revenues, earnings, accounts receivable, total revenue per policy, and lifetime value ("LTV") per policy.

13.    During this time, the Individual Defendants caused the Company to fail to make necessary adjustments to its financial statements to account for the OEP and the resulting lowered persistency rates. Specifically, the Company failed to write down revenue when it became probable that certain insurance policies would not be renewed at the estimated rates that had previously been reported. In addition to causing the Company to fail to make the necessary adjustments to its financial statements, the Individual Defendants concealed the misconduct with false and misleading statements.

14.    The flawed financial statements and the Individual Defendant's misrepresentations had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period, during which time six of the Individual Defendants benefitted from

lucrative insider sales at artificially inflated prices for proceeds of approximately $263.5 million.

15.    The truth began to emerge on May 11, 2021, when the Company hosted a conference call to discuss earnings for the third quarter of the Company's 2021 Fiscal Year. During the call, Defendant Sadun announced "negative cohort and tail adjustments" due to "lower second-term persistency for the 2019 cohort."

16.    On this news, the Company's share price declined by $5.50—approximately 20%—from its May 11, 2021 closing price of $27.40 to close on May 12, 2021 at $21.90.

17.    The truth emerged in full on August 25, 2021, when the Company disclosed that the 2020 cohort also faced persistency problems. Specifically, during a conference call hosted by the Company, Defendant Sadun stated that "[a]ctual persistency in 2019 and 2020 has trended below initial model." He further announced a $65 million placeholder for the potential risk of a cohort tail adjustment in the fourth quarter of the following year.

18.    On this news, the Company's share price declined by $6.46—approximately 45%—from its August 25, 2021 closing price of $14.35 to close on August 26, 2021 at $7.89.

19.    In breach of their fiduciary duties owed to SelectQuote, the Individual Defendants willfully or recklessly made and/or caused the Company to fail to make necessary adjustments to its financial statements. As a result, the Company's reported revenues and other financial metrics were improperly inflated. In the Offering Documents and during the Relevant Period, the Individual Defendants caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's 2019 and 2020 cohorts were experiencing lower-than-estimated persistency due to OEP switching and increased rapid disenrollment; (2) the Company was failing to write down revenue as soon as it became probable that the Company's policies would not be renewed at estimated rates that had previously

been reported; (3) as a result of the foregoing, certain of the Company's reported financial metrics were improperly inflated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, SelectQuote's public statements were materially false and misleading at all relevant times.

20.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while six of the Individual Defendants sold Company shares at inflated prices.

21.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

22.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and six members of its Board of Directors ("Board") to two federal securities fraud class action lawsuits pending in the United States District Court for the Southern District of New York (the "Securities Class Actions") and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

23.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

24.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in

this derivative action and of Defendants Danker's, Devanny's, Devine's, Grant's, Hawks', and Weldon's liability in the Securities Class Actions, of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Securities Act and the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

29.     Plaintiff is a current shareholder of SelectQuote. Plaintiff has continuously held SelectQuote common stock at all relevant times.

**Nominal Defendant SelectQuote**

30.     SelectQuote is a Delaware Corporation with its principal executive offices at 6800 West 115th Street, Suite 2511, Overland Park, Kansas, 66211. SelectQuote's shares trade on the NYSE under the ticker symbol "SLQT."

**Defendant Danker**

31.     Defendant Danker has served as the Company's CEO and as a director since 2017. He joined the Company in 2012 and served in various senior roles from 2012 until 2017. According to the Company's Schedule 14A filed with the SEC on September 27, 2021 (the "2021 Proxy Statement"), as of September 16, 2021, Defendant Danker beneficially owned 1,555,112 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 16, 2021 was $14.20, Defendant Danker owned approximately $22.1 million worth of SelectQuote stock.

32.     For the 2021 Fiscal Year, Defendant Danker received $2,593,585 in compensation from the Company, including $500,000 in salary, $256 in bonus, $1,058,266 in stock awards, $535,394 in option awards, $489,188 in non-equity incentive plan compensation, and $10,481 in all other compensation. For the fiscal year ended June 30, 2020 (the "2020 Fiscal Year") Defendant Danker received $4,314,439 in total compensation, including $326,125 in salary, $256 in bonus, $137,327, and $3,850,731 in all other compensation, which included a November 2019 dividend distribution to stockholders and option holders.

33.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Danker made the following sales of Company common stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 2/25/2021 | 13,604 | $30.56 | $415,779 |
| 2/24/2021 | 73,596 | $30.90 | $2,273,895 |
| 2/23/2021 | 1,700 | $30.02 | $51,042 |
| 2/22/2021 | 11,100 | $30.01 | $333,099 |
| 2/11/2021 | 51,708 | $27.10 | $1,401,286 |
| 2/10/2021 | 33,465 | $27.10 | $906,901 |
| 2/09/2021 | 54,827 | $27.05 | $1,483,070 |
| 2/05/2021 | 23,269 | $25.12 | $584,517 |
| 1/26/2021 | 10,200 | $25.20 | $257,040 |
| 1/25/2021 | 21,642 | $25.12 | $543,647 |
| 1/22/2021 | 8,230 | $25.02 | $205,914 |
| 1/21/2021 | 28,759 | $25.28 | $727,027 |
| 1/20/2021 | 12,900 | $25.01 | $322,629 |
| 5/26/2020 | 223,257 | $18.90 | $4,219,557 |

Thus, before the scheme was exposed, Defendant Danker sold 568,257 shares of Company common stock at artificially inflated prices for proceeds of more than $13.7 million. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

34.     The 2021 Proxy Statement stated the following about Defendant Danker:

**Timothy R. Danker**, 48, has served as Chief Executive Officer of the Company and as a director since 2017. Mr. Danker served as the President of the Company's Life Division from 2016 to 2019, as the Executive Vice President of the Company's Life Division from 2015 to 2016 and as the President of the Company's Auto & Home Division from 2012 to 2015. Prior to joining the Company, Mr. Danker co-founded and served as the Chief Executive Officer of Spring Venture Group, a senior healthcare insurance distribution platform, from 2007 to 2012. Mr. Danker received his undergraduate degree in business administration from the University of Missouri and his Master of Business Administration from the University of Kansas.

**Defendant Sadun**

35.     Defendant Sadun has served as the Company's CFO since 2017. According to the 2021 Proxy Statement, as of September 16, 2021, Defendant Sadun beneficially owned 927,418

shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 16, 2021 was $14.20, Defendant Sadun owned approximately $13.17 million worth of SelectQuote stock.

36.    For the 2021 Fiscal Year, Defendant Sadun received $1,750,919 in compensation from the Company, including $400,000 in salary, $154 in bonus, $629,584 in stock awards, $318,518 in option awards, $391,350 in non-equity incentive plan compensation, and $11,313 in all other compensation. For the 2020 Fiscal Year, Defendant Sadun received $2,850,715 in compensation from the Company, including $310,833 in salary, $50,154 in bonus, $127,500 in non-equity incentive plan compensation, and $2,362,228 in $100,000 in salary and $39,628 in option awards, which included a November 2019 dividend distribution to stockholders and option holders.

37.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sadun made the following sales of Company common stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 2/16/2021 | 64,400 | $27.59 | $1,776,796 |
| 2/12/2021 | 100 | $27.50 | $2,750 |
| 2/09/2021 | 500 | $27.50 | $13,750 |
| 2/08/2021 | 21,559 | $25.10 | $541,130 |
| 2/05/2021 | 81,744 | $25.06 | $2,048,504 |
| 1/26/2021 | 10,296 | $25.19 | $259,356 |
| 1/25/2021 | 21,677 | $25.13 | $544,743 |
| 1/22/2021 | 8,259 | $25.02 | $206,640 |
| 1/21/2021 | 28,674 | $25.28 | $724,878 |
| 1/20/2021 | 12,791 | $25.01 | $319,902 |
| 5/26/2020 | 136,688 | $18.90 | $2,583,403 |

Thus, before the scheme was exposed, Defendant Sadun sold 386,688 shares of Company common

stock at artificially inflated prices for proceeds in excess of $9 million. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

38.     The 2021 Proxy Statement stated the following about Defendant Sadun:

> ***Raffaele Sadun***, 45, has served as the Chief Financial Officer of the Company since 2017. Prior to joining the Company, Mr. Sadun served as the Chief Financial Officer of The Mutual Fund Store from 2014 until its sale in 2016 to Financial Engines, one of the largest independent registered investment advisors in the United States, where he served as Senior Vice President of Finance from 2016 to 2017. Mr. Sadun served as the Chief Financial Officer of Adknowledge, one of the largest digital advertising companies in the United States, from 2012 to 2014 and as the Chief Financial Officer of SeaWorld Parks & Entertainment from 2010 to 2011. Mr. Sadun is an honors graduate in Management of The London School of Economics.

### Defendant Britton

39.     Defendant Britton served as a Company director from 2014 until September 23, 2020. He served as a member of the Compensation Committee upon the consummation of the IPO. According to the Prospectus, Defendant Britton beneficially owned 334,181 shares of Company common stock after the IPO. Given that the price per share of the Company's common stock was $26.92 at the close of trading on May 26, 2020, the completion day of the IPO, Defendant Britton beneficially owned approximately $9 million worth of SelectQuote stock.

40.     For the 2021 Fiscal Year, Defendant Britton received $11,984 in compensation from the Company, consisting of fees earned or paid in cash. For the 2020 Fiscal Year, Defendant Britton received $20,897 in compensation from the Company, consisting of fees earned or paid in cash.

41.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Britton made the following sales of Company common stock at artificially inflated

prices:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 5/26/2020 | 41,159 | $18.90 | $777,905 |

His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42.     The Prospectus stated the following about Defendant Britton:

Donald Britton, 71, has served as a director of the Company since 2014 and as the chair of the Board's Compensation Committee since 2015. Mr. Britton previously served as the President and CEO of the United States Life Insurance and Employee Benefits Business of ING US from 2004 to 2013. After the IPO of ING US in 2013 (renamed Voya), he served in the same role until his retirement in 2014. Prior to that, Mr. Britton served as the President of the Life Division at American General Financial Group from 1999 to 2002, as the President and CEO of the Life and Annuity Business of First Colony Life from 1997 to 1999 and as the Executive Vice President of Marketing and Operations of First Colony Life from 1992 to 1997. Mr. Britton earned his undergraduate and graduate degrees in Mathematics from East Carolina University. Mr. Britton started his career as an actuary at Integon Life and is a Fellow of The Society of Actuaries (FSA). Mr. Britton serves on the Board of LifeMark Re, a private insurance marketing company's wholly owned reinsurance company, which he helped found in 2018. Mr. Britton's extensive experience in the insurance industry qualifies him to serve on our Board of Directors.

**Defendant Devanny**

43.     Defendant Devanny has served as a Company director since February 2020. In addition, he serves as a member of the Audit Committee and Compensation Committee. According to the 2021 Proxy Statement, as of September 16, 2021, Defendant Devanny beneficially owned 46,833 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 16, 2021 was $14.20, Defendant Devanny owned approximately $665,029 million worth of SelectQuote stock.

44.     For the 2021 Fiscal Year, Defendant Devanny received $147,452 in compensation

from the Company, consisting of $40,000 in fees earned or paid in cash and $107,452 in stock awards. For the 2020 Fiscal Year, Defendant Devanny received $504,493 in compensation from the Company, which included in part $4,493 in fees earned or paid in cash and $125,244 in equity awards.

45.     The 2021 Proxy Statement stated the following about Defendant Devanny:

***Earl H. Devanny III***, 69, was appointed to serve as a director of the Company in February 2020. Mr. Devanny has served as the Chief Executive Officer of Tract Manager, a provider of healthcare strategic sourcing and compliance application suites, since 2016. Mr. Devanny previously served as the President of Nuance Communications' healthcare business, a provider of voice and language solutions for businesses and consumers, from 2014 to 2016. Prior to that, Mr. Devanny served as the Chairman and Chief Executive Officer of Trizetto Corporation, a healthcare information technology provider, from 2010 to 2013. Prior to that, Mr. Devanny served as the President of Cerner Corporation, a supplier of health information technology solutions, services, devices, and hardware, from 1999 to 2010. Mr. Devanny has served as a director of Commerce Bancshares, Inc. (NASDAQ: CBSH), the publicly-traded bank holding company for Commerce Bank, since 2010 and currently serves as a director of Next Health Technologies and McNeil Trusts, both private companies. Mr. Devanny received his undergraduate degree from the University of the South (Sewanee). We believe Mr. Devanny's extensive experience in the healthcare technology industry qualifies him to serve on our Board.

## **Defendant Devine**

46.     Defendant Devine has served as a Company director since February 2020. At all relevant times, she served as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2021 Proxy Statement, as of September 16, 2021, Defendant Devine beneficially owned 12,333 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 16, 2021 was $14.20, Defendant Devine owned approximately $175,129 worth of SelectQuote stock.

47.     For the 2021 Fiscal Year, Defendant Devine received $157,099 in compensation

from the Company, including $49,647 in fees earned or paid in cash and $107,452 in stock awards. For the 2020 Fiscal Year, Defendant Devine received $504,493 in compensation from the Company, which included in part $4,493 in fees earned or paid in cash and $125,244 in equity awards.

48.    The 2021 Proxy Statement stated the following about Defendant Devine:

**Denise L. Devine**, 66, has served as a director of the Company since February 2020 and was appointed to serve as Chair of the Compensation Committee in September 2020. Ms. Devine is the founder of FNB Holdings, LLC, a company dedicated to initiatives in the health and wellness space, of which she has served as Chief Executive Officer since 2014. Ms. Devine is also the Co-Founder and Chief Financial Officer of RTM Vital Signs, LLC, a development stage medical device company. Ms. Devine also founded and served as the Chief Executive Officer from 1994 to 2006 of Nutripharm, Inc., a company that has generated a portfolio of composition and process patents to create innovative natural food, beverage, pharmaceutical, and nutraceutical products. Ms. Devine previously served as Chair of the Pennsylvania State Board of Accountancy and on the Board of the American Institute of CPAs. From 2005 to 2015, Ms. Devine was a member of the Board of Trustees of Villanova University and served as the Chair of the Audit and Risk Committee. Ms. Devine has served on the Board of Ben Franklin Technology Partners of Southeastern Pennsylvania since 2016. Ms. Devine has also served as a director of Fulton Financial Corporation (NASDAQ: FULT), of which she is also Chair of the Human Resources Committee, since 2012, and as a director of AgroFresh Solutions, Inc. (NASDAQ: AGFS), of which she is also Chair of the Compensation and Talent Committee, since 2018. Ms. Devine also served as a director of Cubic Corporation (NYSE: CUB) from 2019 until its sale in 2021. Ms. Devine is a Certified Public Accountant, and received her Masters in Business Administration from The Wharton School at the University of Pennsylvania, her Masters in Taxation from Villanova Law School, and her undergraduate degree in Accounting from Villanova University. Ms. Devine's management, business, and finance experience qualifies her to serve on our Board.

**Defendant Grant**

49.    Defendant Grant has served as a director of the Company since 2010 and as the Board's Vice Chairman since 2017. In addition, he previously served as the Company's President from 2015 to 2017. Defendant Grant is the father of the Company's Chief Operating Officer, William Grant III, and the father of the President of the Company's Senior Division, Robert Grant.

According to the 2021 Proxy Statement, as of September 16, 2021, Defendant Grant beneficially owned 3,692,686 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 16, 2021 was $14.20, Defendant Grant owned approximately $52.4 million worth of SelectQuote stock.

50.     For the 2021 Fiscal Year, Defendant Grant received $236,970 in compensation from the Company, consisting of $20,000 in fees earned or paid in cash, $107,452 in stock awards, and $109,518 in all other compensation. For the 2020 Fiscal Year, Defendant Grant received $9,227,826 in compensation, which included a base salary of $220,000, a non-equity incentive bonus of $33,001, and a November 2019 dividend distribution to shareholders and option holders in the amount of $8,968,611.

51.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Grant made the following sales of Company common stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 3/08/2021 | 2,000,000 | $27.50 | $55,000,000 |
| 2/25/2021 | 152,829 | $30.38 | $4,642,180 |
| 2/24/2021 | 146,971 | $30.90 | $4,541,109 |
| 2/23/2021 | 3,100 | $30.02 | $93,049 |
| 2/22/2021 | 22,100 | $30.01 | $663,243 |
| 2/05/2021 | 36,528 | $25.11 | $917,218 |
| 1/26/2021 | 20,400 | $25.20 | $514,080 |
| 1/25/2021 | 43,215 | $25.12 | $1,085,776 |
| 1/22/2021 | 16,579 | $25.02 | $414,806 |
| 1/21/2021 | 57,678 | $25.28 | $1,458,099 |
| 1/20/2021 | 25,600 | $25.01 | $640,256 |
| 5/26/2020 | 671,200 | $18.90 | $12,685,679 |

Thus, before the scheme was exposed, Defendant Grant sold 3,196,200 shares of Company

common stock at artificially inflated prices for proceeds in excess of $82.6 million. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

52.     The 2021 Proxy Statement stated the following about Defendant Grant:

*William Grant II*, 71, has served as a director of the Company since 2010 and as the Vice Chairman of the Board since 2017. Mr. Grant previously served as the Company's President from 2015 to 2017, as the Senior Vice President of Health and Risk Management at Quest Diagnostics Incorporated from 2005 to 2007, and as the Chairman, President, and Chief Executive Officer of LabOne, Inc. from 1995 to 2005. Prior to that, Mr. Grant served as the Chairman of the Board and Chief Executive Officer from 1993 to 1995, and as the President and Chief Executive Officer from 1990 to 1993, of Seafield Capital Corporation. Mr. Grant also served as the President and Chief Executive Officer of Business Men's Assurance Company of America from 1986 to 1990. Mr. Grant has served as a director of Commerce Bancshares, Inc. (NASDAQ: CBSH), the publicly-traded bank holding company for Commerce Bank, since 1983. Mr. Grant received his undergraduate degree from Kansas University and his Masters in Business Administration from The Wharton School at the University of Pennsylvania. Mr. Grant is the father of William Grant III, the Chief Operating Officer of the Company, and Robert Grant, the President of the Company's Senior Division. Mr. Grant's extensive experience in the healthcare industry and deep knowledge of our business qualifies him to serve on our Board.

**Defendant Hawks**

53.     Defendant Hawks has served as a director of the Company since 2014 and was appointed to serve as the Chairman of the Board in February 2020. In addition, he serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Hawks has served as a Managing Director and as President of Brookside Equity Partners LLC ("Brookside") since 2012, the affiliated entities of which beneficially owned 11.2% of the Company as of September 16, 2021. According to the 2021 Proxy Statement, as of September 16, 2021, Defendant Hawks beneficially owned 50,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of

trading on September 16, 2021 was $14.20, Defendant Hawks owned approximately $710,000 worth of SelectQuote stock.

54.     For the 2021 Fiscal Year, Defendant Hawks received $177,452 in compensation from the Company, consisting of $70,000 in fees earned or paid in cash and $107,452 in stock awards.  For the 2020 Fiscal Year, Defendant Hawks received $7,863 in compensation from the Company, consisting of fees earned or paid in cash.

55.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hawks made the following sales of Company common stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 5/26/2020 | 8,323,433 | $18.90 | $157,312,883 |

His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

56.     The 2021 Proxy Statement stated the following about Defendant Hawks:

**Donald L. Hawks III**, 46, has served as a director of the Company since 2014 and was appointed to serve as the Chairman of the Board in February 2020. He has served as a Managing Director and the President of Brookside Equity Partners LLC since its formation in 2012. He is a director of multiple private companies, including BEP AUL Holdings LLC, Cash Management Solutions Limited, Hillsdale Furniture Holdings LLC, and Ultra Aluminum Manufacturing Inc. He serves on the Investment Committee of the Rockefeller Family Fund and is a Board Member of the Fresh Air Fund. Mr. Hawks received his undergraduate degree from Georgetown University and his Masters in Business Administration from The Wharton School at the University of Pennsylvania.

Mr. Hawks was appointed to the Board in 2014 in connection with the Series D Agreement and, pursuant to the terms of the Series D Agreement, was appointed as a Class III director immediately prior to the consummation of our IPO.

18

We believe Mr. Hawks' extensive business experience, including as an investor in and advisor to several companies, qualifies him to serve on our Board.

**Defendant Patel**

57.     Defendant Patel has served as a Company director since September 23, 2020. In addition, she serves as a member of the Nominating and Corporate Governance Committee.

58.     For the 2021 Fiscal Year, Defendant Patel received $274,270 in compensation from the Company, consisting of $30,870 in fees earned or paid in cash, $107,452 in stock awards, and $135,948 in option awards.

59.     The 2021 Proxy Statement stated the following about Defendant Patel:

***Dr. Kavita K. Patel***, 47, was appointed to serve as a director of the Company in September 2020. Dr. Patel has served as a Nonresident Fellow in the Department of Economic Studies at the Brookings Institution since January 2011. Dr. Patel is also a practicing primary care physician at Mary's Center in Washington, D.C. and has served as a Venture Partner at New Enterprise Associates since 2017. Previously, Dr. Patel served as Director of Policy for the Office of Intergovernmental Affairs and Public Engagement in the White House from 2009 to 2010, as Deputy Staff Director on Health on the late Senator Edward Kennedy's staff from 2007 to 2009, and as a member of senior staff of the Senate Health, Education, Labor and Pensions (HELP) Committee. Dr. Patel has served as a director of Sigilon Therapeutics, Inc. (NASDAQ: SGTX) since 2020 and previously served as a director and member of the Governance and Nominating Committee of Tesaro, Inc. (NASDAQ: TSRO) from 2016 until its acquisition by GlaxoSmithKline in 2019. Dr. Patel received her undergraduate degree from the University of Texas at Austin, her Master of Public Health from the University of California at Los Angeles and her medical degree from the University of Texas Health Science Center.

**Defendant Weldon**

60.     Defendant Weldon has served as a member of the Board since 2014 and as the Audit Committee Chairman since 2016. In addition, Defendant Weldon co-founded Brookside, the affiliated entities of which beneficially owned 11.2% of the Company as of September, 16 2021. In addition, he has served since 2012 as one of Brookside's Managing Directors. According to the 2021 Proxy Statement, as of September 16, 2021, Defendant Weldon beneficially owned

50,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 16, 2021 was $14.20, Defendant Weldon beneficially owned approximately $710,000 worth of SelectQuote stock.

61.     For the 2021 Fiscal Year, Defendant Weldon received $164,952 in compensation from the Company, consisting of $57,500 in fees earned or paid in cash and $107,452 in stock awards. For the 2020 Fiscal Year, Defendant Weldon received $6,459 in compensation from the Company, consisting of fees earned or paid in cash.

62.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Weldon made the following sales of Company common stock at artificially inflated prices:[2]

| Date | Number of Shares | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 5/26/2020 | 8,323,433 | $18.90 | $157,312,883 |

His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

63.     The 2021 Proxy Statement stated the following about Defendant Weldon:

**Raymond F. Weldon**, 62, has served as a director of the Company since 2014 and as the Chairman of our Audit Committee since 2016. He is a co-founder of Brookside Equity Partners LLC and has served as one of its Managing Directors since its formation in 2012. Mr. Weldon has been employed by Hillside Capital Incorporated, a private investment company and affiliate of Brookside Equity Partners LLC, since 1999 and currently serves as one of its Managing Directors.

---

[2] Defendant Weldon's sales on May 26, 2020 are the same sales executed by Defendant Hawks on May 26, 2020, which sales were executed through BEP III LLC, BEP III Co-Invest LLC, and SQ Co-investors LLC, entities affiliated with Brookside. Defendant Hawks and Defendant Weldon each owned indirect pecuniary interests in the securities sold by these Brookside-affiliated entities. Additional information concerning these transactions can be found in the Form 4s filed with the SEC by Defendant Hawks and Defendant Weldon on May 26, 2020.

Mr. Weldon is a Certified Public Accountant (inactive) and is a director of several private companies, including TJ Acquisition LLC and Hillsdale Furniture LLC. Mr. Weldon received his undergraduate degree from the Honors Program of LaSalle University and his Masters in Taxation from Villanova University.

Mr. Weldon was appointed to the Board in 2014 in connection with the Company's entry into the Series D Preferred Stock Investors' Rights and Stockholders Agreement (as amended, the "Series D Agreement") and, pursuant to the terms of the Series D Agreement, was appointed as a Class II director immediately prior to the consummation of our initial public offering (our "IPO").

We believe Mr. Weldon's extensive business experience, including as an investor in and advisor to several companies, qualifies him to serve on our Board.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

64.     By reason of their positions as officers, directors, and/or fiduciaries of SelectQuote and because of their ability to control the business and corporate affairs of SelectQuote, the Individual Defendants owed SelectQuote and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SelectQuote in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of SelectQuote and its shareholders so as to benefit all shareholders equally.

65.     Each director and officer of the Company owes to SelectQuote and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

66.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SelectQuote, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

67.     To discharge their duties, the officers and directors of SelectQuote were required to exercise reasonable and prudent supervision over the management, policies, controls, and

operations of the Company.

68.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of SelectQuote, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of SelectQuote's Board at all relevant times.

69.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

70. To discharge their duties, the officers and directors of SelectQuote were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of SelectQuote were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to SelectQuote's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how SelectQuote conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of SelectQuote and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that SelectQuote's operations would comply with all applicable laws and SelectQuote's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements

made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.     Each of the Individual Defendants further owed to SelectQuote and the shareholders the duty of loyalty requiring that each favor SelectQuote's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

72.     At all times relevant hereto, the Individual Defendants were the agents of each other and of SelectQuote and were at all times acting within the course and scope of such agency.

73.     Because of their advisory, executive, managerial, directorial, and controlling positions with SelectQuote, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

74.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by SelectQuote.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

75.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

76.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

77.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of SelectQuote was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

78.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

79.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of SelectQuote, and was at all times acting within the course and scope of such agency.

## SELECTQUOTE'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *SelectQuote's Code of Conduct*

80.     The Code of Conduct, in its "Introduction," states that the Company's "officers, associates, business partners and our Board of Directors are held to the highest standards of ethics and are responsible for demonstrating behaviors consistent with those high standards and our core values."

81.     In a section titled "Compliance with Laws, Rules and Regulations," the Code of Conduct provides as follows:

> Obeying the law, both in letter and in spirit, is the foundation on which our ethical standards are built. All of our officers, associates and directors (collectively our "Associates"), must respect and obey the laws and regulations of the United States, as well as the cities and states in which we serve our customers, and comply with all applicable laws and regulations designed to prevent and deter fraud, waste and abuse. Although not all Associates are expected to know the details of all of these laws, it is important to know enough to determine when to seek advice from supervisors, managers, or other appropriate resources.

82.     In a section titled "Disclosure to the SEC and the Public," the Code of Conduct provides as follows:

> Our policy is to provide full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in our other public communications. Accordingly, Associates must ensure that they and others in the Company comply with our disclosure controls and procedures and our internal controls for financial reporting. In the event any Associate believes or suspects that any information that is filed with, or submitted to the SEC, or otherwise made publicly available is materially inaccurate or misleading, or if such Associate has identified or has suspicion of a material weakness in the Company's public reporting procedures, such Associate shall promptly raise such concern with one of the following: the Chief Financial Officer, the General Counsel or the Chairman of the Audit Committee (or other member of the Audit Committee, as may be appropriate). Such report may be made on an anonymous basis.

83.     In a section titled "Financial Reporting and Record Keeping," the Code of Conduct

provides as follows:

> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation. The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. For example, only the true and actual number of hours worked should be reported.

> Business records and communications often become public, and we should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos, postings to social media sites, and formal reports. Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation please consult the Company's General Counsel.

84.     In a section titled "Insider Trading," the Code of Conduct provides as follows:

> Associates who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All information about the Company should be considered confidential information. To use information that is not readily available to the public for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal.

85.     In a section titled "Reporting any Illegal or Unethical Behavior," the Code of

Conduct provides as follows:

> Associates are encouraged to talk to supervisors, managers or other appropriate personnel when in doubt about the best course of action in a particular situation. It is the policy of the Company not to allow retaliation, retribution or intimidation for reports of misconduct by others made in good faith by Associates. Associates are expected to cooperate in internal investigations of misconduct.

### *Audit Committee Charter*

86.     The Company's Audit Committee Charter provides that the Audit Committee's

purpose is to oversee the following:

- The accounting and financial reporting processes of the Company and audits of the financial statements of the Company;
- The integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; the independent auditor's qualifications, independence, performance, and compensation; and the Company's internal controls over financial reporting and disclosure controls and procedures;
- The preparation and approval of the reports that the rules of the Securities and Exchange Commission (the "SEC") require be included in the Company's annual proxy statement;
- The Company's internal audit function;
- Transactions between the Company and a related party; and
- The application of the Company's Code of Business Conduct and Ethics.

87.     The Audit Committee Charter provides that the Audit Committee's responsibilities

include oversight of the Company's system of internal controls over financial reporting, as follows:

> Overseeing the Company's system of internal controls over financial reporting, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

88.     The Audit Committee Charter requires that the Audit Committee review and

discuss the Company's annual audited financial statements and unaudited financial statements, as

follows:

> Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," in connection with filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

89.     The Audit Committee Charter also tasks the Audit Committee with engaging the

Company's independent auditors to review the Company's interim financial statements:

> Engaging the Company's independent auditors to review, prior to filing with the SEC, the Company's interim financial statements included in Quarterly Reports on

Form 10-Q, using professional standards and procedures for conducting such reviews;

90.     The Audit Committee Charter charges the Audit Committee with reviewing the Company's press releases for compliance with generally accepted accounting principles ("GAAP"), as follows:

> Reviewing, prior to announcement, the Company press releases containing material financial information and discussing with management whether such press releases properly disclose financial information presented in accordance with GAAP and, to the extent non-GAAP information is included, applicable rules and regulations of the SEC governing the disclosure of such non-GAAP information;

91.     The Audit Committee Charter also tasks the Audit Committee with "[r]eviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements."

92.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue a materially false and misleading statement to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Securities Act and Exchange Act. In further violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations; refrain from illegal and unethical conduct; ensure "full, fair, accurate, timely, and understandable disclosure"; and properly report violations of the Code of Conduct. Moreover, six of the Individual Defendants violated the Code of Conduct's prohibition on insider trading by selling Company shares at inflated prices for aggregate proceeds of approximately $263.5 million.

93.     In violation of the Audit Committee Charter, Defendants Weldon, Devanny, and Devine (the "Audit Committee Defendants") conducted little, if any, oversight of the Company's

engagement in the Individual Defendants' scheme to issue a materially false and misleading statement to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee the Company's accounting and financial reporting processes; oversee the Company's internal controls over financial reporting; review the Company's financial reports; and ensure the Company's compliance with legal and regulatory requirements.

## BACKGROUND

94.    SelectQuote is a Delaware corporation based in Overland Park, Kansas that operates a direct-to-consumer insurance policy distribution platform. A significant portion of the policies sold by the Company are Medicare Advantage and Medicare Supplement plans.

### OEP Replaces the Disenrollment Period

95.    In 2019, the Disenrollment Period was replaced by the OEP, allowing enrollees in Medicare Advantage Plans to switch between Medicare Advantage Plans, whereas under the Disenrollment Period they had only been able to drop Medicare Advantage Plans and return to Original Medicare. Additionally, the OEP period lasts from January 1 to March 31, in contrast to the much shorter Disenrollment Period, which stretched only from January 1 to February 14.

96.    As a result of OEP replacing the Disenrollment Period, which occurred in 2019, the Company faced a greater risk that beneficiaries who had enrolled in Medicare Advantage Plans would drop the Company's plan in favor of other Medicare Advantage Plans.

97.    This risk came to pass. The Company began experiencing lower-than-expected persistency rates for the 2019 cohort, which coincided with the initiation of the new OEP.

Enrollees' rapid disenrollment caused a decline in the Company's renewal commissions, with actual renewal commissions falling significantly below estimated future renewal commissions that had already been recognized as revenue.

**The Company Reports Financial Metrics Based on Estimated Renewal Commissions**

98.     As a publicly traded Company incorporated in Delaware and operating in the United States, the Company employs generally accepted accounting principles ("GAAP"), including for external reporting purposes. The Company also reports some non-GAAP financial metrics.

99.     GAAP is codified in the Accounting Standards Codification ("ASC"), which is maintained by the Financial Accounting Standards Board. An ASC provision of critical importance to the Company is ASC 606, which deals with the revenue from contracts with customers.

100.     ASC 606-10-05-4 sets forth a five-step process for recognizing revenue: "Step 1: Identify the contract(s) with a customer"; "Step 2: Identify the performance obligations in the contract"; "Step 3: Determine the transaction price"; "Step 4: Allocate the transaction price to the performance obligations in the contract"; and "Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation."

101.     The Company purports to comply with ASC 606 for purposes of revenue recognition. Specifically, the Company's annual report for the 2020 Fiscal Year filed on September 10, 2020 (the "2020 10-K") states that the Company recognizes revenue pursuant to the following five-step procedure, which mirrors the five-step process set forth in ASC 606-10-05-4:

> In accordance with ASC 606, revenue is recognized when a customer obtains control of promised goods or services and is recognized in an amount that reflects the consideration that an entity expects to receive in exchange for those goods or services. We apply the following five-step model in order to determine this amount: (i) identification of the promised goods in the contract; (ii) determination of whether the promised goods are performance obligations, including whether they

are distinct in the context of the contract; (iii) measurement of the transaction price, including the constraint on variable consideration; (iv) allocation of the transaction price to the performance obligations; and (v) recognition of revenue when (or as) we satisfy each performance obligation.

102.    In discussing this five-step process, the 2020 10-K further explained that the Company employs its discretion in determining how to recognize revenue for any given period, stating, "[s]ignificant management judgments and estimates must be made in connection with determination of the revenue to be recognized in any accounting period." The 2020 10-K also explained that this discretion involves a number of "assumptions" and "estimates," as well as historical data:

> If we made different judgments or utilized different estimates for any period, material differences in the amount and timing of revenue recognized could result. ***The accounting estimates and judgments related to the recognition of revenue require us to make assumptions about numerous factors*** such as the determination of performance obligations and determination of the transaction price. ***The estimates of renewal commissions and production bonuses and other revenue*** are considered variable consideration in the transaction price and ***require significant judgment including determining the number of periods in which a renewal will occur and the value of those renewal commissions to be received if renewed.***

(Emphasis added.)

103.    The Company's 2020 10-K explains how the Company purports to comply with ASC 606. In a section titled "Revenue Recognition and Commissions Receivable," the 2020 10-K notes that the Company uses the "expected value" approach to estimating variable consideration.

104.    Regarding variable consideration, ASC 606-10-32-8 sets forth that, under the "expected value" approach, "[t]he expected value is the sum of probability-weighted amounts in a range of possible consideration amounts. An expected value may be an appropriate estimate of the amount of variable consideration if an entity has a large number of contracts with similar characteristics."

105.    The 2020 10-K explains how the Company purports to estimate renewal commissions under the "expected value" approach. Specifically, the 2020 10-K asserts that the Company "constrain[s] revenue recognized to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur":

> We utilize the expected value approach to do this, incorporating a combination of historical lapse and premium increase data, available industry and carrier experience data, historical payment data by segment and insurance carrier, as well as current forecast data to estimate forecasted renewal consideration and production bonuses and then *to constrain revenue recognized to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur.*

(Emphasis added.) Thus, the Company purports to comply with the third step of the five-step framework in ASC 606-10-05-4, which provides that "*[t]he estimated amount of variable consideration will be included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur* when the uncertainty associated with the variable consideration is subsequently resolved." (Emphasis added.)

106.    The 2020 10-K further explains that the Company estimates revenue by grouping policies together in various cohorts:

> The Company utilizes a practical expedient to estimate commission revenue by applying the use of a portfolio approach to policies grouped together by the segment, insurance carrier, product type, and quarter the policy was initially sold (referred to as a "cohort"). This provides a practical approach to estimating the renewal commissions expected to be collected for each cohort by evaluating various factors, including but not limited to, contracted commission rates, insurance carrier mix, premium increases, and persistency rates.

107.    In addition to basing its revenue on estimates of future renewal commissions, the Company also reports certain other financial metrics based on future renewal commissions. For instance, the Company reports the financial metric of LTV per approved policy, which the 2020

10-K explains as follows:

> Lifetime value of commissions per approved policy represents commissions estimated to be collected over the estimated life of an approved policy based on multiple factors, including but not limited to, contracted commission rates, carrier mix and expected policy persistency with applied constraints. ***The lifetime value of commissions per approved policy is equal to the sum of the commission revenue due upon the initial sale of a policy, and when applicable, an estimate of future renewal commissions.*** The estimate of the future renewal commissions is determined using contracted renewal commission rates constrained by a persistency-adjusted 10-year renewal period based on a combination of our historical experience and available insurance carrier historical experience to estimate renewal revenue only to the extent probable that a material reversal in revenue would not be expected to occur. These factors may result in varying values from period to period. The lifetime value of commissions per approved policy represents commissions only from policies sold during the period. That figure excludes renewals during the period from policies originally sold in a prior period with insurance carrier partners whose contracts preclude us from recognizing variable consideration for estimated renewal commissions and updated estimates of prior period variable consideration based on actual policy renewals in the current period.

(Emphasis added.)

108.    The Company's metrics based on estimated renewal commissions also include accounts receivable. For instance, the 2020 10-K states as follows:

> Accounts receivable represents either first year ***or renewal commissions expected to be received*** on policies that have already been sold or renewed and for production bonus revenue that has been earned but not received from the insurance carrier. Typically, the Company receives commission payments as the insurance carriers receive payments from the underlying policyholders. As these can be on various payment terms such as monthly or quarterly, a receivable is recorded to account for the commission payments yet to be received from the insurance carriers.

(Emphasis added.)

109.    The Company has admitted that its reliance on the "expected value" approach and its reliance on estimates of renewal commissions in reporting certain financial metrics poses risks to the Company. Specifically, the 2020 10-K states as follows:

> ***Our operating results will be impacted by factors that impact our estimate of the constrained lifetime value of commissions per policyholder.***

Effective July 1, 2018, we elected to early adopt Accounting Standards Update ("ASU") 2014-09, *Revenue from Contracts with Customers* ("ASC 606"), using the full retrospective method, which required us to revise our historical financial information for fiscal 2018 to be consistent with the new standard. The adoption had a material impact on our historical financial statements, including the method by which we recognize commission revenue. We now recognize revenue based on the expected value approach. This approach utilizes a number of assumptions, which include, but are not limited to, legal and enforceable rights to renewal commissions upon contract termination when determining variable consideration, renewal commission rates, historical lapse data and premium increase data. These assumptions are based on historical trends and any changes in those historical trends will affect our estimated lifetime value estimates in future periods and therefore could adversely affect our revenue and financial results in those future periods. As a result, adverse changes in the assumptions we make in computing expected values, such as increased lapse rates, would harm our business, operating results, financial condition and prospects.

***In particular, if customer lapse rates exceed our expectations, we may not receive the revenues we have projected to receive over time, despite our having incurred and recorded any related customer acquisition costs up front. Any adverse impact on customer lapse rates could lead to our receipt of commission payments that are less than the amount we estimated when we recognized commission revenue. Under such circumstances, we would need to write-off the remaining commission receivable balance, which would result in a change to earnings in the period of the write-off.***

(Second emphasis added.)

### **Disclosure Requirements**

110.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public

companies, such as SelectQuote, with respect to their finances and operations.

111.    Specifically, Item 303(b)(2)(i) required SelectQuote to:

Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, would be material to an understanding of the registrant's results of operations.

112.    Item 303(b)(2)(ii) required SelectQuote to:

Describe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that are reasonably likely to cause a material change in the relationship between costs and revenues (such as known or reasonably likely future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship must be disclosed.

113.    Additionally, Item 105 of Regulation S-K required the Individual Defendants to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky."

114.    Even after the IPO was effectuated, the Individual Defendants had a duty to disclose pursuant to Item 303 of Regulation S-K, which requires that all Form 10-Qs and 10-Ks filed with the SEC include a section on "[m]anagement's discussion and analysis of financial condition and results of operations" that includes, inter alia: (1) "descriptions and amounts of matters that have had a material impact on reported operations," and (2) "matters that are reasonably likely based on management's assessment to have a material impact on future operations."

115.    Therefore, the Individual Defendants had a duty throughout the Relevant Period to cause the Company to disclose all material facts related to: (1) lower persistency in the 2019 and 2020 cohorts; (2) the Company's failure to write down revenue as soon as it became probable that the Company's policies would not be renewed at the rates previously estimated; (3) the negative impacts of the foregoing on the Company's reported financial metrics; and (4) the Company's failure to maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

116.    In the Offering Documents and during the Relevant Period, the Individual Defendants caused the Company to report improperly inflated financial metrics, including revenues, earnings, accounts receivable, revenue per policy, and lifetime value of commissions

per approved policy. The Individual Defendants also failed to disclose the known trend of lower persistency among the 2019 and 2020 cohorts.

117.    The Individual Defendants failed to make necessary adjustments to its financial statements. Specifically, the Individual Defendants failed to cause the Company to adjust its financial statements to write down revenue as soon as it became probable that its policies would not be renewed at previously reported estimated rates. Such adjustments were required under ASC 606-10-05-4. SelectQuote was required to write down recognized revenue when it learned of lower persistency rates in the 2019 cohort and when it became probable that estimated renewal rates supporting the Company's calculations would not be realized.

118.    In addition, the Individual Defendants issued materially false and misleading statements and omissions of material fact that concealed the need to make necessary adjustments to the SelectQuote's financial statements and the Company's failure to make such adjustments. Furthermore, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

### False and Misleading Statements Prior to the Relevant Period

*Registration Statement*

119.    The Company filed the Registration Statement on February 21, 2020, which was subsequently amended four times and declared effective on May 20, 2020. Defendants Danker, Sadun, Hawks, Grant, Britton, Devanny, Devine, and Weldon signed the Registration Statement.

120.    In the Registration Statement, the Company reported net income for the fiscal year ended June 30, 2019 (the "2019 Fiscal Year") of $72.6 million. The Company also reported $59.9 million in accounts receivable as of June 30, 2019 and $76.9 million in accounts receivable as of March 31, 2020.

121.    The Registration Statement also reported LTV per approved policy of $1,279 for Medicare Advantage Plans for the 2019 Fiscal Year and $1,312 for Medicare Supplement plans for the 2019 Fiscal Year. Furthermore, the Company reported total revenue per Medicare Advantage / Medicare Supplement policies of $1,547.

122.    The statements in ¶¶ 120–121 were materially false and misleading, misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's 2019 and 2020 cohorts were experiencing lower-than-estimated persistency due to OEP switching and increased rapid disenrollment; (2) the Company was failing to write down revenue as soon as it became probable that the Company's policies would not be renewed at estimated rates that had previously been reported; (3) as a result of the foregoing, certain of the Company's reported financial metrics were improperly inflated; and (4) the Company failed to maintain internal controls.

**False and Misleading Statements During the Relevant Period**

***May 22, 2020 Prospectus***

123.    On May 22, 2020, the Company filed the Prospectus, which formed a part of the Registration Statement.

124.     In the Prospectus, the Company reported net income for the 2019 Fiscal Year of $72.6 million. The Company also reported $59.9 million in accounts receivable as of June 30, 2019 and $76.9 million in accounts receivable as of March 31, 2020.

125.    The Registration Statement also reported LTV per approved policy of $1,279 for Medicare Advantage Plans for the 2019 Fiscal Year and $1,312 for Medicare Supplement plans for the 2019 Fiscal Year. Furthermore, the Company reported total revenue per Medicare

Advantage / Medicare Supplement policies of $1,547.

### *September 9, 2020 Conference Call*

126.    On September 9, 2020, the Company hosted a conference call for investors and analysts to discuss its financial results for the 2020 Fiscal Year. During the call, Defendant Sadun discussed the effect the new OEP was having on the Company's lifetime value estimates. Specifically, he admitted that the Company had "experienced slightly lower overall persistency." However, he stated that "this lower persistency is included in our LTV calculations" and that "nothing has fundamentally changed on the persistency front."

### *September 10, 2020 Form 10-K*

127.    On September 10, 2020, the Company filed the 2020 10-K. The 2020 10-K was signed by Defendants Danker, Sadun, Britton, Devanny, Devine, Grant, Hawks, and Weldon, and contained certifications, signed by Defendants Danker and Sadun, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

128.    In the 2020 10-K, the Company reported total revenue for the 2020 Fiscal Year of $531.5 million, as well as net income of $81.1 million. The Company also reported accounts receivable of $83.6 million as of June 30, 2020. For the 2020 Fiscal Year, the Company reported LTV per approved policy of $1,287 for Medicare Advantage policies and $1,376 for Medicare Supplement policies. For the 2019 Fiscal Year, the Company reported LTV per approved policy of $1,287 for Medicare Advantage policies and $1,312 for Medicare Supplement policies. The Company further reported $1,485 in total revenue per Medicare Advantage / Medicare Supplement

policies for the 2020 Fiscal Year. The Company also repeated certain metrics for the 2019 Fiscal

Year, including revenue, earnings, accounts receivable, lifetime value of commissions per

approved policy, and total revenue per policy.

### September 29, 2020 Proxy Statement

129.     On September 29, 2020, the Company filed its Schedule 14A with the SEC (the

"2020 Proxy Statement"). Defendants Danker, Devanny, Devine, Grant, Hawks, Patel, and

Weldon solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act,

which contained material misstatements and omissions.

130.     The 2020 Proxy Statement called for Company shareholders to, *inter alia*:

(1) re-elect Defendants Danker and Patel to the Board; and (2) ratify the appointment of Deloitte

& Touche LLP as the Company's independent registered public accounting firm for the 2021

Fiscal Year.

131.     The 2020 Proxy Statement stated the following regarding the Board's risk oversight

functions:

> One of the key functions of our Board is informed oversight of our risk management
> process. Our Board does not have a standing risk management committee, but
> rather administers this oversight function directly through our Board as a whole, as
> well as through its standing committees that address risks inherent in their
> respective areas of oversight. In particular, our Board is responsible for fulfilling
> its oversight responsibilities regarding the Company's policies and processes with
> respect to enterprise risk assessment and management, including any significant
> non-financial risk exposures.

132.     The 2020 Proxy Statement also stated the following regarding the responsibilities

of the Audit Committee, which at that time consisted of Defendants Weldon (as Chair), Devanny,

and Devine:

> Our audit committee is responsible for reviewing and discussing with management
> and the independent auditor our financial risk exposures (including our investment
> policies) and assessing the policies and process management has implemented to

monitor and control such exposures. Our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our external audit function.

133.    The 2020 Proxy Statement was materially misleading because it failed to disclose that, contrary to the 2020 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to fail to make necessary adjustments to its financial statements, were issuing or causing the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

134.    The 2020 Proxy Statement also failed to disclose that: (1) the Company's 2019 and 2020 cohorts were experiencing lower-than-estimated persistency due to OEP switching and increased rapid disenrollment; (2) the Company was failing to write down revenue as soon as it became probable that the Company's policies would not be renewed at estimated rates that had previously been reported; (3) as a result of the foregoing, certain of the Company's reported financial metrics were improperly inflated; and (4) the Company failed to maintain internal controls.

135.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders reelected Defendants Danker and Patel to the Board, allowing them to continue breaching their fiduciary duties to SelectQuote.

### *November 5, 2020 Conference Call*

136.    On November 5, 2020, the Company held a conference call for analysts and investors to discuss the Company's financial results for the first quarter of the 2021 Fiscal Year, which ended September 30, 2020. During the call, Defendant Sadun highlighted the Company's

"separation of persistency in LTV results versus our peers." Defendant Sadun acknowledged that, "with the introduction of OEP and the ability for seniors to switch plans more easily, we have experienced slightly lower overall persistency." However, Defendant Sadun sought to reassure investors by noting that the "lower persistency is included in our LTV calculations" and that "[n]othing has changed on the persistency front since we discussed this last quarter."

### November 6, 2020 Form 10-Q

137.     On November 6, 2020, the Company filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended September 30, 2020 (the "1Q21 10-Q"). The 1Q21 10-Q was signed by Defendants Danker and Sadun and contained SOX certifications signed by Defendants Danker and Sadun attesting to the accuracy of the financial statements contained in the 1Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

138.     The 1Q21 10-Q reported total revenue of $124 million for the first quarter of the 2021 Fiscal Year, with net income of $837,000. The Company also reported accounts receivable of $69.3 million as of September 30, 2020.

139.     The Company reported LTV per approved policy of $1,168 for Medicare Advantage plans and $1,274 for Medicare Supplement plans for the first quarter of the 2021 Fiscal Year, as well as total revenue per Medicare Advantage / Medicare Supplement policies of $1,501 for the twelve months ended September 30, 2020.

140.     The 1Q21 10-Q also reported revenues for the quarter ended September 30, 2019. For that quarter, the 1Q21 10-Q reported total revenues of $65.2 million and net income loss of $1.69 million. For that same quarter, the 1Q21 10-Q reported LTV per approved policy of $1,163 for Medicare Advantage policies and $1,275 for Medicare Supplement policies, as well as $1,504

in total revenue per Medicare Advantage / Medicare Supplement policies for the twelve months ended September 30, 2019.

### December 3, 2020 Piper Sandler Conference

141.    On December 3, 2020, the Company and certain executives participated in the Piper Sandler Health Care Conference.  In responding to a question concerning the Company's strong LTV figures compared to its peers, Defendant Sadun touted the Company's "industry-leading persistency," stating as follows: "any way you slice it, SelectQuote earns significantly higher LTV per policy than our peers, *which is primarily due to our industry-leading persistency.*" (Emphasis added.)

### February 8, 2021 Form 10-Q

142.    On February 8, 2021, the Company filed its quarterly report for the fiscal quarter ended December 31, 2020 (the "2Q21 10-Q"). The 2Q21 10-Q was signed by Defendants Danker and Sadun and contained SOX certifications signed by Defendants Danker and Sadun attesting to the accuracy of the financial statements contained in the 2Q21 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

143.    In the 2Q21 10-Q, the Company reported total revenue of $482.4 million for the six months ended December 31, 2020 and $358.2 million for the three months ended December 31, 2020. The Company also reported net income of $91.3 million for the six months ended December 31, 2020 and $90.4 million for the three months ended December 31, 2020. The Company reported accounts receivable of $147 million as of December 31, 2020.

144.    Regarding Medicare Advantage policies, the Company reported LTV per approved policy of $1,268 for the three months ended December 31, 2020, $1,251 for the six months ended

December 31, 2020, $1,268 for the three months ended December 31, 2019, and $1,250 for the six months ended December 31, 2019.

145.    Regarding Medicare Supplement policies, the Company reported LTV per approved policy of $1,233 for the three months ended December 31, 2020, $1,248 for the six months ended December 31, 2020, $1,367 for the three months ended December 31, 2019, and $1,340 for the six months ended December 31, 2019.

146.    The Company reported total revenue per Medicare Advantage / Medicare Supplement policies of $1,483 for the twelve months ended December 31, 2020 and $1,479 for the twelve months ended December 31, 2019.

147.    In the 2Q21 10-Q, the Company also reported total revenue of $176.3 million for the three months ended December 31, 2019 and $241.5 million for the six months ended December 31, 2019. The Company reported net income of $39.1 million for the three months ended December 31, 2019 and $37.4 million for the six months ended December 31, 2019.

148.    The statements in ¶¶ 124–26, 128, 136, 138–41, 143–47 were materially false and misleading, misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's 2019 and 2020 cohorts were experiencing lower-than-estimated persistency due to OEP switching and increased rapid disenrollment; (2) the Company was failing to write down revenue as soon as it became probable that the Company's policies would not be renewed at estimated rates that had previously been reported; (3) as a result of the foregoing, certain of the Company's reported financial metrics were improperly inflated; and (4) the Company failed to maintain internal controls.

**The Truth Begins to Emerge**

### *May 11, 2021 Conference Call*

149.   The truth began to emerge after markets closed on May 11, 2021, when the Company hosted a conference call with investors and analysts to discuss the Company's financial results for the third quarter of the 2021 Fiscal Year, which ended March 31, 2021. During the call, Defendant Sadun stated that the Company anticipated "having a negative cohort and tail adjustment in the fourth quarter" due to "lower second-term persistency for the 2019 cohort." Defendant Sadun further stated, "that specific cohort has been underperforming," and he stated that the underperformance was driven by "the ability for seniors to change more frequently" as a result of the OEP implementation in 2019.

150.   On this news, which was released after markets closed on May 11, 2021, the Company's share price declined by $5.50 per share from its May 11, 2021 closing price of $27.40 per share to close May 12, 2021 at $21.90.

151.   However, the full truth remained concealed due to the Individual Defendants' misrepresentations and omissions of material fact.

### *May 18, 2021 RBC Capital Markets Healthcare Conference*

152.   On May 18, 2021, Defendants Danker, Sadun, and Grant presented at the RBC Capital Markets Healthcare Conference. During the presentation, Defendant Sadun asserted that the Company was "not seeing the same dynamic with later cohorts tha[t] we are with 2019 cohort."

153.   Also during the May 18, 2021 conference, Defendant Sadun stated that "the 2019 cohort had persistency assumptions from prior years that didn't include the type of switching activity" seen during OEP. He further asserted that "the later cohorts now capture that type of activity with respect to OEP switching."

154.   The statements contained in ¶¶ 152–53 were materially false and misleading, and

failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) like the 2019 cohort, the Company's 2020 cohort was experiencing lower-than-estimated persistency as a result of OEP and rapid disenrollment; (2) the Company had failed to write down revenue as soon as it became probable, based on the foregoing, that the Company's 2020 cohort would not be renewed at the estimated rates previously reported; (3) as a result of the foregoing, certain of the Company's reported financial metrics were improperly inflated; and (4) the Company failed to maintain internal controls.

### The Full Truth Emerges

155.    The truth emerged on August 25, 2021, when the Company hosted a conference call for investors and analysts to discuss the Company's earnings for the fourth quarter of the Company's 2021 Fiscal Year, which ended June 30, 2021. During the call, Defendant Sadun stated that "[a]ctual persistency in 2019 and 2020 has trended below initial model."

156.    Also during the call, Defendant Sadun announced a $65 million "placeholder for the potential cohort tail adjustment" for the fourth quarter of the following year.

157.    On this news, which was released after markets closed on August 25, 2021, the Company's share price fell $6.46 from its August 25, 2021 closing price of $14.35 to close August 26, 2021 at $7.89, a loss of approximately 45%.

### DAMAGES TO SELECTQUOTE

158.    As a direct and proximate result of the Individual Defendants' misconduct, SelectQuote has lost and will continue to lose and expend many millions of dollars.

159.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Actions filed against the Company, its CEO, its CFO, and six of its current or

former directors; any internal investigations; and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

160.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

161.    As a direct and proximate result of the Individual Defendants' conduct, SelectQuote has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

162.    Plaintiff brings this action derivatively and for the benefit of SelectQuote to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of SelectQuote, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof, as well as for contribution under Section 11(f) of the Securities Act and Sections 10(b) and 21D of the Exchange Act.

163.    SelectQuote is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

164.    Plaintiff is, and has been at all relevant times, a shareholder of SelectQuote. Plaintiff will adequately and fairly represent the interests of SelectQuote in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

165.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

166.    A pre-suit demand on the Board of SelectQuote is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Danker, Devanny, Devine, Grant, Hawks, Patel, and Weldon (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of seven Directors who are on the Board at the time this action is commenced.

167.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to fail to make necessary adjustments to its financial statements and to make false and misleading statements and omissions of material facts, while four of them conducted insider sales for proceeds of approximately $253.7 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

168.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Directors caused the Company to fail to maintain internal controls. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

169.    Additional reasons that demand on Danker is futile follow. Defendant Danker is currently the Company's CEO and has served in that role since 2017. Previously, he served in

various senior roles at the Company from 2012 until 2017. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Danker with his principal occupation for which he receives handsome compensation, including $2.59 million in the 2021 Fiscal Year and $4.31 million in the 2020 Fiscal Year. As CEO, Defendant Danker was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including the statements contained in the 2020 10-K, the 1Q21 10-Q, and the 2Q21 10-Q, each of which he personally signed and for which he signed SOX certifications. In addition, the 2020 Proxy Statement was solicited on his behalf, and the false and misleading statements contained therein contributed to his reelection to the Board. Furthermore, he signed, and therefore personally made, the false and misleading statements in the Registration Statement. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to issue false and misleading statements and to fail to make necessary adjustments to its financial statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Danker is a defendant in the Securities Class Actions. In addition, during the Relevant Period, he sold 568,257 shares of Company common stock at artificially inflated prices for proceeds of approximately $13.7 million. For these reasons, Defendant Danker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on Devanny is futile follow. Defendant Devanny has served as a Company director since February 2020 and is also a member of the Audit Committee and Compensation Committee. As a Company director, he receives significant compensation from the Company, as discussed above. In addition, the 2020 Proxy Statement was

solicited on Defendant Devanny's behalf. Furthermore, he signed, and therefore personally made, the false and misleading statements in the Registration Statement and the 2020 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to issue false and misleading statements and to fail to make necessary adjustments to its financial statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Devanny is a defendant in the Securities Class Actions. For these reasons, Defendant Devanny breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Devine is futile follow. Defendant Devine has served as a Company director since February 2020. At all relevant times, she served as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. As a Company director, she receives significant compensation from the Company, as discussed above. In addition, the 2020 Proxy Statement was solicited on her behalf. Furthermore, he signed, and therefore personally made, the false and misleading statements in the Registration Statement and the 2020 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to issue false and misleading statements and to fail to make necessary adjustments to its financial statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Devine is a defendant in the Securities Class Actions. For these reasons, Defendant Devine breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Grant is futile follow. Defendant Grant has served as a Company director since 2010 and has served as the Board's Vice Chairman since 2017. He served as the Company's President from 2015 to 2017 and is the father of the Company's Chief Operating Officer, William Grant III, and the President of the Company's Senior Division, Robert Grant. Thus, as the Company admits, he is a non-independent director. His sons, who are Company executives, sold Company stock at artificially inflated prices during the Relevant Period for collective proceeds in excess of $51 million. As a Company director, Defendant Grant receives significant compensation from the Company, as discussed above. In addition, the 2020 Proxy Statement was solicited on his behalf. Furthermore, he signed, and therefore personally made, the false and misleading statements in the Registration Statement. As a trusted Company director and as the Board's Vice Chairman, he conducted little, if any, oversight of the scheme to cause the Company to issue false and misleading statements and to fail to make necessary adjustments to its financial statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Grant is a defendant in the Securities Class Actions. In addition, during the Relevant Period, he sold 3.2 million shares of Company common stock at artificially inflated prices for proceeds of over $82.6 million. For these reasons, Defendant Grant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Hawks is futile follow. Defendant Hawks has served as a Company director since 2014, and he was appointed to serve as the Board's Chairman in February 2020. In addition, he serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. He is also a Managing

Director and the President of Brookside. As a Company director, he receives significant compensation from the Company, as discussed above. In addition, the 2020 Proxy Statement was solicited on his behalf. Furthermore, he signed, and therefore personally made, the false and misleading statements in the Registration Statement and the 2020 10-K. As a trusted Company director and as the Board's Chairman, he conducted little, if any, oversight of the scheme to cause the Company to issue false and misleading statements and to fail to make necessary adjustments to its financial statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Hawks is a defendant in the Securities Class Actions. In addition, during the Relevant Period, and in connection with his role at Brookside, Defendant Hawks sold 8.3 million shares of Company common stock at artificially inflated prices for proceeds of over $157.3 million. For these reasons, Defendant Hawks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Patel is futile follow. Defendant Patel has served as a Company director since September 23, 2020, in which capacity she serves as a member of the Nominating and Corporate Governance Committee. As a Company director, she receives significant compensation from the Company, as discussed above. In addition, the 2020 Proxy Statement was solicited on her behalf, and the false and misleading statements contained therein contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to issue false and misleading statements and to fail to make necessary adjustments to its financial statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously

disregarded her duties to protect corporate assets. For these reasons, Defendant Patel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

175.     Additional reasons that demand on Defendant Weldon is futile follow. Defendant Weldon has served as a member of the Board since 2014 and as the Chairman of the Audit Committee since 2016. He is also a Managing Director and co-founder of Brookside. As a Company director, he receives significant compensation from the Company, as discussed above. In addition, the 2020 Proxy Statement was solicited on his behalf. Furthermore, he signed, and therefore personally made, the false and misleading statements in the Registration Statement and the 2020 10-K. As a trusted Company director and as Chair of the Audit Committee, he conducted little, if any, oversight of the scheme to cause the Company to issue false and misleading statements and to fail to make necessary adjustments to its financial statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Weldon is a defendant in the Securities Class Actions. In addition, during the Relevant Period, and in connection with his role at Brookside, Defendant Weldon sold 8.3 million shares of Company common stock at artificially inflated prices for proceeds of over $157.3 million. For these reasons, Defendant Weldon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176.     Additional reasons that demand on the Board is futile follow.

177.     The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Hawks and Weldon have

been closely affiliated since 2012 through their roles at Brookside. Defendant Weldon co-founded Brookside and has served as one of its Managing Directors since its formation in 2012. Defendant Hawks has also served as a Managing Director of Brookside since 2012 and, in addition, he also served as Brookside's President during that period. Through their connection at Brookside, Defendants Hawks and Weldon sold Company stock at artificially inflated prices in the IPO. Moreover, according to the 2021 Proxy Statement, Defendant Hawks and Defendant Weldon both serve as directors of entities affiliated with Hillsdale Furniture, a home furnishings retailer. Defendant Devanny and Defendant Grant have served as directors of Commerce Bancshares, Inc. since 2010. In addition, Defendant Danker, Defendant Grant, Defendant Grant's son Robert Grant, the President of the Company's Senior Division, and Defendant Grant's son William Grant III, the Company's Chief Operating Officer, are part-owners of Spring Venture Group, a senior healthcare insurance distribution platform from which the Company purchases leads. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

178.   In violation of the Audit Committee Charter, the Audit Committee Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to fail to make necessary adjustments to its financial statements, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Audit Committee Defendants failed to adequately oversee the Company's accounting and financial reporting processes; oversee

the Company's internal controls over financial reporting; review the Company's financial reports; and ensure the Company's compliance with legal and regulatory requirements. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

179.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to fail to make necessary adjustments to its financial statements, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations; refrain from illegal and unethical conduct; ensure "full, fair, accurate, timely, and understandable disclosure"; and properly report violations of the Code of Conduct. Moreover, four of the Directors violated the Code of Conduct's prohibition on insider trading by selling 12.1 million Company shares at inflated prices for aggregate proceeds of approximately $253.7 million. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

180.    SelectQuote has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for SelectQuote any part of the damages SelectQuote suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

181.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and

intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

182.    The acts complained of herein constitute violations of fiduciary duties owed by SelectQuote's officers and directors, and these acts are incapable of ratification.

183.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of SelectQuote. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Directors or certain of the officers of SelectQuote, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

184.    If there is no directors' and officers' liability insurance, then the Directors will not cause SelectQuote to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

185.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of

them, at least four of the Directors, cannot consider a demand with disinterestedness and

independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against the Defendants Danker, Devanny, Devine, Grant, Hawks, Patel, and Weldon for
Violations of Section 14(a) of the Exchange Act**

186.     Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

187.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall

be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security)

registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

188.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no

proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. § 240.14a-9.

189.     Under the direction and watch of the Defendants Danker, Devanny, Devine, Grant,

Hawks, Patel, and Weldon, the 2020 Proxy Statement failed to disclose that, contrary to the 2020

Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's

responsibilities, the Board and its committees were not adequately exercising these functions, were

causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

190.    The 2020 Proxy Statement further failed to disclose that: (1) the Company's 2019 and 2020 cohorts were experiencing lower-than-estimated persistency due to OEP switching and increased rapid disenrollment; (2) the Company was failing to write down revenue as soon as it became probable that the Company's policies would not be renewed at estimated rates that had previously been reported; (3) as a result of the foregoing, certain of the Company's reported financial metrics were improperly inflated; and (4) the Company failed to maintain internal controls.

191.    In the exercise of reasonable care, Defendants Danker, Devanny, Devine, Grant, Hawks, Patel, and Weldon should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2020 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement, including but not limited to, the reelection of Defendants Danker and Patel.

192.    The false and misleading elements of the 2020 Proxy Statement led to, among other things, the reelection of the Defendants Danker and Patel, which allowed them to continue to breach their fiduciary duties to SelectQuote.

193.    The Company was damaged as a result of the Defendants Danker's, Devanny's, Devine's, Grant's, Hawks', Patel's, and Weldon's material misrepresentations and omissions in the 2020 Proxy Statement.

194.    Plaintiff, on behalf of SelectQuote, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of SelectQuote's business and affairs.

197.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

198.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of SelectQuote.

199.    In breach of their fiduciary duties owed to SelectQuote, the Individual Defendants willfully or recklessly made and/or caused the Company to fail to make necessary adjustments to its financial statements. As a result, the Company's reported revenues and other financial metrics were improperly inflated. The Individual Defendants also caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's 2019 and 2020 cohorts were experiencing lower-than-estimated persistency due to OEP switching and increased rapid disenrollment; (2) the Company was failing to write down revenue as soon as it became probable that the Company's policies would not be renewed at estimated rates that had previously been reported; (3) as a result of the foregoing, certain of the Company's reported financial metrics were improperly inflated; and (4) the Company failed to maintain internal controls. As a result of the foregoing, SelectQuote's public statements were materially false and misleading at all relevant times.

200.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while six of them conducted insider sales of Company common stock for proceeds of approximately $263.5 million, which renders them personally liable to the Company for breaching their fiduciary duties.

201.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

202.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of SelectQuote's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

203.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

204.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, SelectQuote has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

205.    Plaintiff on behalf of SelectQuote has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

206.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SelectQuote.

208.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from SelectQuote that was tied to the performance or artificially inflated valuation of SelectQuote, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

209.    Plaintiff, as a shareholder and a representative of SelectQuote, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

210.    Plaintiff on behalf of SelectQuote has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

211.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

212.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence SelectQuote, for which they are legally responsible.

213.    As a direct and proximate result of the Individual Defendants' abuse of control, SelectQuote has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

214.     Plaintiff on behalf of SelectQuote has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

215.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of SelectQuote in a manner consistent with the operations of a publicly-held corporation.

217.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, SelectQuote has sustained and will continue to sustain significant damages.

218.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

219.     Plaintiff on behalf of SelectQuote has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

220.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

221.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

222.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused SelectQuote to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, and to lose financing from investors and

business from future customers who no longer trust the Company and its products.

223.     As a result of the waste of corporate assets, the Individual Defendants and are each

liable to the Company.

224.     Plaintiff on behalf of SelectQuote has no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Danker, Sadun, Britton, Devanny, Devine, Grant, Hawks, and Weldon
for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

225.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

226.     As a result of the conduct and events alleged above, the Company has been named

as a defendant in the Securities Class Actions brought on behalf of SelectQuote shareholders in

which it is a joint tortfeasor in claims brought under Sections 11, 12(a)(2), and 15 of the Securities

Act.

227.     Federal law provides SelectQuote with a cause of action against other alleged joint

tortfeasors under Section 11(f) of the Securities Act.

228.     The plaintiffs in the Securities Class Actions allege that the Offering Documents

were false and misleading, contained untrue statements of material facts, omitted to state facts

necessary to make the statements made not misleading, and omitted to state material facts required

to be stated therein.

229.     SelectQuote is the registrant for the IPO. The Defendants named herein were

responsible for the contents and dissemination of the Offering Documents.

230.     As issuer of the shares, SelectQuote is strictly liable to plaintiffs and the class for

the misstatements and omissions alleged in the Securities Class Actions.

231.     Defendants Danker, Sadun, Britton, Devanny, Devine, Grant, Hawks, and Weldon, because of their positions of control and authority as officers and directors of SelectQuote, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of SelectQuote, including the wrongful acts complained of herein and in the Securities Class Actions.

232.     Accordingly, Defendants Danker, Sadun, Britton, Devanny, Devine, Grant, Hawks and Weldon are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

233.     As such, SelectQuote is entitled to receive all appropriate contribution or indemnification from Defendants Danker, Sadun, Britton, Devanny, Devine, Grant, Hawks and Weldon.

## EIGHTH CLAIM

### Against Defendants Danker and Sadun for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

234.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

235.     SelectQuote, Defendant Danker, and Defendant Sadun are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Danker's and Sadun's willful and/or reckless violations of their obligations as officers and/or

director of SelectQuote.

236.    Defendants Danker and Sadun, because of their positions of control and authority as CEO and CFO of SelectQuote, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of SelectQuote, including the wrongful acts complained of herein and in the Securities Class Actions.

237.    Accordingly, Defendants Danker and Sadun are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

238.    As such, SelectQuote is entitled to receive all appropriate contribution or indemnification from Defendants Danker and Sadun.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of SelectQuote, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to SelectQuote;

(c)    Determining and awarding to SelectQuote the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing SelectQuote and the Individual Defendants to take all necessary actions to reform and improve SelectQuote's corporate governance and internal procedures to

comply with applicable laws and to protect SelectQuote and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

> 1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;
>
> 2. a provision to permit the shareholders of SelectQuote to nominate at least four candidates for election to the Board;
>
> 3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

> (e)    Awarding SelectQuote restitution from Individual Defendants, and each of them;

> (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

> (g)    Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 25, 2022                           Respectfully submitted,

Of Counsel:                                     **FARNAN LLP**

**THE BROWN LAW FIRM, P.C.**                    */s/ Michael J. Farnan*
Timothy Brown                                   Brian E. Farnan (Bar No. 4089)
767 Third Avenue, Suite 2501                    Michael J. Farnan (Bar No. 5165)
New York, NY 10017                              919 N. Market St., 12th Floor
Telephone: (516) 922-5427                       Wilmington, DE 19801
Facsimile: (516) 344-6204                       Telephone: (302) 777-0300
Email: tbrown@thebrownlawfirm.net               Facsimile: (302) 777-0301
                                                Email: bfarnan@farnanlaw.com
                                                Email: mfarnan@farnanlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

                                                *Attorneys for Plaintiff*